## MARTHA C. NICHOLLS et al. *v.* ALFRED MERCIER.

The doctrine in the case of the same plaintiffs v. *McCall*, 13 An., p. 215, affirmed, to the effect that, where, in a forced sale of property, a change in the terms of the sale more favorable to the seized debtor, is made, such change will not invalidate the sale ; it will be presumed to have been made at the instance of the debtor, and he is estopped from contesting it.

APPEAL from the Third District Court of New Orleans, *Duvigneaud*, J. *I. E. Morse & C. N. Morse*, for plaintiff and appellant. *P. Soulé*, for defendant.

MERRICK, C. J. The facts of this case cannot (with a single exception) be distinguished from the case of the same plaintiffs against *Henry McCall*, reported in 13 An., p. 215. The suit is to recover a house and lot upon Rampart Street, sold under the same execution under which *McCall* held. The plaintiff, in order to rebut the presumption in favor of the Sheriff's acts under the execution, has shown that the Sheriff did not collect the revenues of the property during the time it is alleged to have been under seizure, but on the contrary, the rent of the houses on Circus Street were, during the whole period, paid to plaintiffs' agent, and, during a portion of the time, the rents of the property on Rampart Street were paid to no one, and have not been paid to this day.

The defendant also supposes that he has strengthened the present case on his part, by the production of a letter, wherein the plaintiffs proposed, in the event the real defendant, *P. Soulé*, should be sent abroad on an important public mission, to take a lease of the house on Rampart Street, from the latter.

The case has been principally argued in this court on two grounds, to-wit : that there never was any valid seizure of the property, the Sheriff never having had corporeal possession of the same ; and that the acts of the agent, *Cenas*, could not bind the defendant by way of estoppel.

The earnestness with which this case is pressed upon our attention, as well as the strenuous exertions made in the former case to bring about a different result, and the new facts proven, require us to reconsider the questions then and now presented.

In May, 1844, the plaintiff, *Isaac E. Morse,* addressed a letter to the Board of Directors of the Union Bank, (his mortgage creditor,) wherein, among other things, he said : " But if the Direction think that a forced sale for cash must be made, I trust the Bank will sell the lots on Circus Street separately, and will bid a fair price for the property, which I believe, at the most depressed times, will bring enough to pay off all the bank debt and leave something for my mother and myself. The only favor, then, that I ask is, if it be possible, to get along without sacrificing this property, until after the payment of the bank bonds, in November, (which, I trust, will save the credit of the institution,) and that then the property stock, &c., shall be sold for cash, if you think best, or if you do not want the money immediately, for such credit as you may consent to, for, argue as you may, property will always bring, at a credit, much more than the highest interest added, for the single reason, that where there is one person for cash, there are ten on a credit."

This delay was accorded the plaintiff. In November, the plaintiff, being about to return to his duties at Washington, as a member of Congress, executed with his mother the following power of Attorney :

" New Orleans, November 14, 1844.

" We, the undersigned, do hereby nominate and appoint our friend, *Hilary B. Cenas,* of the city of New Orleans, to be our lawful agent and attorney in fact for us, in all matters in relation to the real estate, bank stock, to sign and make notes, receipts, to compromise, sell, and empowering him to use our names jointly and severally and *in solido,* to bind us in any manner that can bind ourselves, hereby ratifying and confirming all of his acts and signatures, to have the same force and effect as if the same had been done by ourselves."

Signed,                                    MARTHA C. MORSE,
                                           ISAAC E. MORSE,
                 *Sole heirs and executors of N. Morse, dec'd.*"

In January following, an order of seizure and sale issued, to sell the property mortgaged and bank stock, for cash. The bank stock, it is admitted, was at this time an incumbrance upon the property. The history of the proceeding after the seizure will appear from the testimony of *Mr. Cenas.* He says :

" He is the party named in the power of attorney, &c. He was also appointed and sworn as curator to *Mr. Morse.* At the time the proceedings took place in the suit of the *Union Bank* v. *M. C. Nichols et al.,* No. 16,512, *Mr. Morse* was in Washington City, a member of Congress. *Mr. Morse,* previous to his departure for Washington City, handed to witness the power of attorney herein filed, and told witness that he had been endeavoring to effect a settlement with the Union Bank, of his and his mother's indebtedness to said bank ; that that debt was secured by mortgage upon his property on Rampart Street, and that he was anxious to have the property sold or disposed of to pay the debt, and that he had actually offered the property, as witness understood him, to the bank, in payment of the debt, and had been in treaty with the bank to that effect; that something would have to be done very soon, as the bank was pressing for a settlement, and that he thought best to leave the power of attorney to sell the property, in case the bank should consent to a private sale. *At any rate, witness was to confer with the bank, and to do the best he could.* Witness was under the impression, at the time, from the conversation he had with *Mr. Morse,* that the property had to be sold that winter, and that if not sold, as he desired, the bank would proceed

to sell under its mortgage ; he informed the bank, through *Mr. Frey*, the cashier, that he held the power of attorney, and was ready to do all he could to subserve the interest of *Mr. Morse* and his mother in the matter. Some time after, witness was informed that the property was seized, and would be advertised for sale, under the mortgage. At about the same time, witness was appointed curator *ad hoc.* Deeming the sale of the property, as advertised, for cash and in block, as exceedingly objectionable and unfavorable to *Mr. Morse* and his mother, witness applied himself to the task of having the terms changed, if possible, and made more favorable, as he thought that the property had under all circumstances to be sold. Witness had several conversations with *Mr. Frey,* the cashier, and *Mr. Adams,* who was president or one of the principal directors, and whether through the representation of witness, or some other cause, the sale, as first advertised, did not take place, and more favorable terms were afterwards granted by the bank, upon which the property was sold. The terms to which witness refers, are those as stated in the advertisement for the sale on the 24th of June, 1845. The sale was very well attended. There were a great many bidders present, considering the condition of the property and the general depression existing at that time. Witness considered the sale a favorable one at that time. *Mr. Morse* never complained to witness of his action in the matter,—expressed no dissatisfaction until the inception of the present suit."

Among other things, on the cross-examination, the witness says, that he does not know whether the terms of sale were altered by the bank, and for the purpose of saving themselves, or through the solicitations of witness. He further says, there was no positive agreement between him and the bank, prior to the sale, as to the terms upon which the property was to be sold.

The examination in chief being resumed, the witness further said, " that he considered he was acting as the agent of plaintiff, in his double capacity of agent and friend, when he applied to the bank to grant terms of credit for the sale of the property. Witness had previously exhibited to *Mr. Frey* his power of attorney, and formally notified him that he was prepared to act, under the power, for the interest of his constituents. It was after making this application, that the sale was stopped under the first advertisements. Witness was aware that the terms of the new advertisements were to be made more easy, but he did not know the exact terms until he saw the advertisements. Witness was satisfied with the terms upon which the property was advertised the second time. Considered them favorable to the present plaintiffs. Never made any subsequent application to the bank for any modification of the terms of the sale."

The bank passed two resolutions, one (based, it seems, upon the plaintiff's letter,) on the 7th of March, 1845, wherein they consent to sell the property by parcels, and distribute the stock accordingly ; and the other on the 25th of April, 1845, in these words :

" The Board, on motion, consented to have the property of the estate of *N. Morse,* mortgaged to the bank for the stock loan, sold in lots, as specified in the resolution of 7th March last, and on the following terms, viz : The purchaser to be entitled to a loan of twenty dollars per share on the stock, payable according to the terms of the charter, and the balance of the purchase money payable one-fifth cash, the remainder in notes 6, 12, and 18 months, bearing 7 per cent. interest per annum, satisfactorily endorsed, and secured by mortgage on the property."

The property was sold on the terms of credit consented to by the bank, and

the purchasers went into the peaceable enjoyment of the property. They were not disturbed until the institution of this suit, nine years afterwards.

In August, 1851, the cashier of the bank wrote to the plaintiff, and, inclosing him a statement of his account, wherein the proceeds of the sale of his property were carried to his credit, requested propositions for the settlement of the balance. Instead of making any objections to the application of the proceeds, or the sale itself, he stated that, if he had the means, he would pay every dollar. In another place he says : " It is a source of deep mortification to me not to be able to meet this debt due the bank. That feeling is somewhat softened by the fact, that every cent of property left by my father *has been sold* to pay his debts, and that the stock, say 525 shares, for some of which I paid $26, would have paid the debt, and I presume is to-day worth the balance, and I assure you *the house now owned by Mr. Soulé, Mr. J. H. Sheppard* offered me $25,000 in 1834, before I left the city."

In April, 1852, the plaintiff offered, as already stated, to lease the house from *Mr. Soulé*, then the owner in the event of a certain contingency. *Broughton* v. *King*, 2 An. 571.

The writ shows that the Sheriff *seized* the property. It was advertised for sale, for cash. *Cenas*, as the agent of the plaintiff to sell and compromise, had knowledge of the fact, and set himself to procure the modification of the sale, and succeeded. The property was sold on such terms as he wished, and the purchaser was put in possession, which he has held to this day. This does not appear to us to be what plaintiff calls it, a mere paper seizure. Neither is the seizure defeated by proof of the fact that the Sheriff neglected to collect the rents. The seizure may have existed notwithstanding the Sheriff may not have done his whole duty to the bank. The best proof of the actual seizure of the property results from the fact, that the Sheriff had the power to transfer the possession as well as property to the purchasers.

We have been referred to common law authorities, to show that this court based its former opinion upon an erroneous conception of the doctrine of estoppels.

The estoppel spoken of by us in the former case, was that equitable estoppel arising both from the acts of the party and his agents, which had induced a change of conduct on the part of the bank, and doubtless had inspired confidence on the part of purchasers, that they were acquiring a good title, and they were thus induced to bid at that time a full price.

The bank, in accordance with plaintiff's request, delayed proceedings until after November. In January, they resolved to sell in the usual manner, and had made their seizure accordingly. The agent of the plaintiff, with full authority to sell and compromise, and in pursuance of his instructions to do the best he could with the bank, set himself to procure a modification of the terms of the sale, and was fortunate in obtaining terms entirely satisfactory to himself, viz, a credit of $20 on each share of stock, and the balance one-fifth cash, and the residue on a credit of six, twelve, and eighteen months. Under these favorable terms, the property was advertised. The agent was present at the sale, and such was the confidence of the public in the reality of the sale, and the easy terms agreed upon, that there was a full attendance of bidders, and a fair price given for the property. Under these circumstances, it has seemed to us, under our system of law, that the plaintiff ought not to be heard to controvert the validity of a sale made in accordance with his wishes, as previously expressed by letter, and at the urgent

solicitations of his agent, charged with the duty of making the best terms he could with the bank. It also seems to us, under the circumstances, a matter of no great consequence whether the notices of sale had been formally served upon the agent, or not, or whether he had aided in appointing the appraisers. *He was present at the sale, and knowing that the property must be sold, and having procured terms which were entirely satisfactory,* he had no reason to oppose the sale, but on the contrary, it was every way desirable, that it should take place. Neither could the agent in good faith have opposed the sale for want of notice, or on account of the expiration of the return day in the writ. His agency in procuring the delay and change in the terms of sale, as well as his knowledge of the proceedings, would not have justified him in making formal objections on the day of sale. The interest of his principal, as well as good faith, demanded that he should derive all possible advantage from the favorable terms of the sale which he had brought about.

If *Cenas* could not justly have opposed the sale *then*, his principal cannot rightfully attack it now, and this is what we mean when we say he is estopped. It is no new doctrine. The precise kind of estoppel was sanctioned by the court in the case of *Seawell* v. *Payne*, 5 An. 258. See also 5 Rob. 523 ; 1 An. 11 ; 5 An. 368.

But, it is objected, that the sale did not follow the requirements of the writ and order of seizure and sale. The answer to this objection has already been given. The parties had power to change the terms of sale, and did so : what they had agreed upon was just as obligatory as though it had been incorporated in the writ by the Judge.

Again, it is said, that there was no written authority from the defendants in execution, to the Sheriff authorizing the terms of sale which he announced.

The parol testimony in this case, the same being received without objection, and having the force of written evidence, shows that the agent was not only authorized to compromise or sell, but was instructed to make the best terms he could, and so he " applied himself to the task of having the terms of sale changed and made more favorable " to the plaintiff, *and succeeded.* The authority to the Sheriff is thus satisfactorily shown ; 8 An. 283 ; 9 An. 363. ; 3 La. 460.

But, it is said the agent did not, prior to the sale, enter into " any categorical agreement, either verbal or written, between the bank and witness, (agent,) fixing the terms of sale." It is quite clear, we think, that the resolution of the bank was *consented* to, (as it purports,) at the instance of plaintiff's agent, and although he did not know the exact terms which he had obtained until he saw the new advertisements, he knew that they were to be made more easy. As these terms were satisfactory to the agent, they received his consent by his silence during the interval between the advertisements and the sale, and by his presence at the sale, thus sanctioning the proceeding and approving of the conduct of third persons in bidding upon the property and investing their money therein. Spoken or written words ought not to be more binding than this silence of the agent, to whose solicitation these very terms had been accorded. Civil Code, 1805, 1811.

The view we have thus taken of the case, makes it unnecessary to consider any further matters urged by plaintiff in his argument and brief, or by defendant's counsel in answer to the same.

After a careful review of the facts and authorities, we are satisfied of the correctness of the former decree. The agent of the plaintiff was authorized to

procure the terms of sale, which he did 'procure, and his principal is bound by them.

Judgment affirmed.

DUFFEL, J., concurring. Without expressing any opinion in regard to the various causes of nullities pleaded by the plaintiffs, I concur in the decree rendered in this case, because I am satisfied that all the grounds of nullities have been cured by the acts of *Isaac E. Morse,* who is now the only plaintiff in the cause. Those confirmatory acts are : 1st, the letter of the 15th of August, 1851, from the plaintiff to *Mr. Geo. A. Freret,* cashier of the Union Bank, in answer to a letter of the latter calling his "attention to the annexed statement of account against the estate of his father, showing a balance due on the bond, of $9,175 85, &c.," and asking for a settlement of said balance, and interest ; and 2dly, the letter of the 22d April, 1852, from the plaintiff to *Mr. P. Soulé.* In the letter to *Mr. Freret,* the plaintiff expresses his desire to pay said balance, but his inability to do so, and concludes his letter as follows : "As I said before, should it ever be in my power to settle this debt, nothing would afford me more pleasure." He also says that (with the exception of a house, lot and a few servants, which are all mortgaged to the Citizens' Bank and *J. C. Wedderstrandt.*) he and his mother have no property. He alludes to the sale of the property by the bank, gives in cypher the amount produced by the sale, and expresses his satisfaction that " every cent of property left by my father has been sold to pay his debts," adding, " and I assure you that the house now owned by *Mr. Soulé, Mr. J. H. Shepperd* offered me $25,000, in 1834, before I left the city." In the other letter, the plaintiff says : " P. S. The hopes and wishes of your friends here point to you in connection with an important mission abroad : should such an event transpire, the ladies insist that I should ask of you to let me know what disposition you propose to make of your house in Rampart Street, and not to rent it without letting me know the terms, &c."

The above letters, taken in connection with the testimony of *Mr. Cenas,* the plaintiff's agent, in the suit against *Henry McCall,* that "*Mr. Morse* never complained to witness of his action in the matter,—expressed no dissatisfaction until the inception of the present suit," convince me that the plaintiff was well aware, at the date of his first letter, of all the informalities on which he now relies to set aside the Sheriff's sale, and consequently, that he cannot now question the legality of the proceedings, without, at least, pleading and proving error, which he failed to do. C. C. 2252 ; *Charles Fortier* v. *Charles F. Zimpel,* 6 An. 53 ; *Vaughan et al.* v. *Christine et al.,* 3 An. 328 ; *Marsh* v. *Smith,* 5 R. 218 ; *Blanchard* v. *Allain,* 5 An. 368 ; *Cobb et al.* v. *Parham et al.,* 4 An. 148 ; *Bonneau* v. *Poydras,* 2 R. 1 ; *Broughton* v. *King,* 2 An. 569.

VOORHIES, J., concurs in this opinion.

LAND, J., took no part in this case.